Good morning. Our first case of the day is Kaiser v. Alcoa USA Corp. Mr. Ramire. May it please the Court. David Ramire for Appellants Alcoa USA Corp. and the Health Plans. Your Honors, the whole point of judicial estoppel is to prevent a party from winning one suit by arguing A and a second suit by arguing not A. Yet in the litigation below, the District Court estopped Alcoa on the basis of representations it did not make in a suit it could not have won on the basis of those representations. What is more, the District Court did this after certifying a class alleging the breach of dozens of distinct collective bargaining agreements, without identifying any common terms among those contracts, many of which were not even in the record, and without any regard for the reality that the relief plaintiffs sought was fundamentally incompatible with the Rule 23b2 class. All of that warrants reversal. Alcoa is aware of no case in which a party has been estopped in even remotely similar circumstances, and it simply cannot be the law that a court can certify a collection of contract claims without the underlying contracts. So with regard to that point, turning to classification, I believe in your briefs you point out two different types of CBAs, generally speaking. Correct. One are those that are silent as to the duration of the retiree health benefits, and the other are those that provide the benefits shall continue for the life of the agreement. In either case, at least it seems like from Cherry and our prior cases, Roseto, that the objective extrinsic evidence can be used to create some ambiguity with regard to those contracts. And it seems like in both cases the objective evidence, if you take plaintiff's theory, seems to at least raise a question as to ambiguity with regard to those two types of CBAs. And so why can't the district court on a 23B2 class just focus on that common issue and certify the class as a district court did? So a couple of responses, Your Honor. In the first place, I don't know how the district court is supposed to conduct that analysis with respect to the contracts that are not in the record. We have approximately 600 of the 3,000 class members in this case who are governed by CBAs that are not in the record, even under Cherry and the cases that plaintiffs cite. But other than the two broad categories of CBAs that you identified, are there any other variations with regard to that particular issue? Well, quite frankly, Your Honor, we don't know because those contracts aren't in the record. Plaintiffs are alleging a breach of a contract where they don't know what those terms of those contracts say because those contracts haven't been located, they haven't been submitted. And even with respect to the contracts that aren't in the record, Cherry and that line of cases all require interaction with the terms, with the language of the actual contract. And that analysis is going to be different for each contract at issue because you have to see not only whether there is an ambiguity, but you also have to see how whatever extrinsic evidence plaintiffs put forward interact with the other terms in that contract. Well, they don't have to establish that the contract in and of itself within the four corners is ambiguous, right? I mean, that's the peerless case, that even if the contract within the four corners doesn't appear to be ambiguous, one could use objective extrinsic evidence. But this Court has said in BIDLAC that even in that scenario, there has to be some language in the contract that you hang the label ambiguous on. Even in your peerless example, Your Honor, the word peerless was in the contract. You had to have the contract to know that there was a ship called peerless that you were even considering. So again, I don't know how you conduct that analysis if you don't have the contract. And I don't know how you do that across a class if you don't have common terms that are in each of the collective bargaining agreements. And there's been no indication whatsoever of common terms among the entire universe of dozens, potentially hundreds of CBAs that are at issue here, either that directly award plaintiffs vested benefits or on which you could even hang the term ambiguous. So even under this Court's precedent on latent ambiguity, you still have to have some common terms. We're aware of no case – you know, all those cases also involve individual contracts, and all of those cases had the CBAs. The Court was interacting with the specific language of the contracts at issue there. We're aware of no case, you know, particularly in this context, where if retiree medical benefits vest at all, they vest pursuant to the terms of a specific contract. That's what this Court has said repeatedly. So I don't understand how you have a breach of contract claim across dozens of distinct collective bargaining agreements that relies solely on extrinsic evidence without any regard for what those individual contracts say. What about the district court's finding that as to the master agreements that they're substantively – they have substantively identical language? So even with respect to the master agreements, we're not considering – those master agreements don't apply across the board. They only apply to a specific subset of, you know, the pre-1993 population. And there's no – again, no language that's even been identified in those master agreements that are common across all contracts. The district court pointed to a couple of phrases, which plaintiffs notably don't attempt to defend on appeal, that were just completely divorced from any context. They basically involved situations in which government legislation impacted the level of benefits being provided. And in that case, the parties would get together and negotiate adjustments. But we would review that finding under clear error, right? I believe class certification decisions are reviewed under an abuse of discretion standard. No, no, but the factual finding that the master agreements had substantively identical language. That, to me, seems like a factual finding that we would review under clear error. I think it sounds much more like the sort of typical contract interpretations your honors normally would review under a de novo standard. Even in the case of an abuse of discretion standard, it's very often that there's underlying legal prerequisites that this court is going to review at a plenary level before deciding whether when it pieces all together the court abused or did not abuse its discretion in certifying the class. And again, even if you take those master agreements, that is not common across the entire class. And you have distinctions, again, to the language even the district court pointed to. Some of the CBAs in the record don't even contain the language the court pointed to about government reductions in benefits or adjustments to benefits. So our bottom line position on this, your honor, is that whatever standard of review you're applying, if you're certifying a class action for a breach of contract, you at least have to have the contracts before you. You have to identify some common terms so you can decide whether or not this is something you can resolve all in one stroke. And that's even without getting to the problem with the B2 class here, your honor, where the district court essentially certified what is, for all intents and purposes, a claim for individualized damages. You have plaintiffs who are going to, you have class members who are now going to have to submit individualized medical records that ALCOA or its representative is going to have to review. They're going to have to compare them to the terms of the prior plan. They're going to have to compare them to the terms of whatever medical coverage. But ALCOA would have to do that regardless for any future benefits, right? So assuming, okay, let's take the prior claims out of it, right? So if we, if ALCOA, if we affirm the district court's decision, ALCOA would then have to reinstate the procedures that it was using to administer these claims. And so the only difference between administering the prior claims and the past claims, it seems to me, is just whether or not that there were kind of double recovery issues in the prior claims to see if the previous class members received any benefits from other sources. But other than that, it seems to me that the procedures would be the same, right? I mean, the review would be the same because that's what plaintiffs are asking for. But that's also not insignificant, Your Honor, because you're going to have to look at whatever prior coverage was available. It's not insignificant, but is it legally incidental? I mean, I guess that's the question. No, Your Honor, because it adds another factor. It is anything but purely mechanical. I mean, when this, again, as you well know, B-2 class actions, individualized monetary relief is only appropriate if it's incidental. And this court has said that means it involves no more than a mechanical computation. And we'd submit, Your Honor, that if you're having to take two plans, see whether a claim was covered under one, see whether it was covered under the other, then factor in copayments, insurance, deductibles, all of that. Frankly, with respect to prior claims, I'm not even sure how you factor in what they paid with respect to deductibles because that's done as lump sum over the overarching scheme of their benefits as opposed to one individual claim. And then also in this case, you have to compute interest as well. So there's additional computations that come into play in this case that just aren't here when you're talking about prospective. What would your limiting principle be for that? Because if there was coverage, there was an obligation to do that in the first place. And I think part of what Judge Lee is getting at, we're just shifting the time in which you had to do that. It seems like your rule would essentially say there's no class actions for anything related to coverage disputes. No, Your Honor, because, again, there's another factor that comes into play here. There's whatever coverage they had at the time. And that puts this kind of, again, in this court's bucket that we discussed in JBS where not only do you have these individualized determinations, but B2 class actions are also only appropriate when the relief award is final. And what the court is doing in this case is it's not offering final relief to the parties as a whole. It's setting up basically an individualized claims processing process whereby ACOA is going to set up a process out of court to basically do what plaintiffs literally said they were doing to avoid the court having to take the time and effort to do. Plaintiffs themselves recognized the burden involved in computing these claims. They initially brought this request as a damages request. And then when it came time for judgment, they literally said, well, actually, no, just do what we said is damages. Do that as an injunction so that we can avoid the time and effort of processing all those individualized claims. Plaintiffs themselves think this is burdensome. I think that's a strong indication that this is more than the purely mechanical process this court has contemplated in other contexts. Do you mind if we transition to judicial estoppel in the limited time that we have? How did ACOA in the Curtis litigation distinguish between the pre- and post-1993 retirees? Well, in the Curtis litigation, Your Honor, the only retirees at stake there were the post-1993 retirees. The pre-1993 retirees weren't even before the court. And ACOA made no representations whatsoever regarding the pre-1993 retirees. And to the extent it did, it wouldn't have mattered because there's literally There's, in the ACOA opposition, there's a reference docket 132-4. Plaintiffs here seek to receive benefits as if they had retired before June 1, 1993. So I think it's a little bit of an extension of that, that there was a reference to pre-1993. Sure. What ACOA was doing with that representation was essentially trying to illustrate the absurdity of the Curtis plaintiff's position. Illustrate what? I'm sorry. The absurdity of the Curtis plaintiff's position. The parties had spent many, many hours negotiating a cap on post-1993 medical benefits. The Curtis plaintiffs walked into court and basically said, that cap literally doesn't matter. We should be able to receive benefits as if that cap doesn't exist. ACOA was saying, that's ridiculous. Again, the whole litigation was about the cap. To read into that, anything regarding ACOA's position on vesting just doesn't make any sense whatsoever, particularly when we consider that these are two stray comments. And ACOA's consistent position throughout that litigation, including in its post-trial brief at JA 316, is that retiring medical benefits do not vest. It would be quite odd for ACOA to reverse its lead argument in its post-trial brief on the basis of those passing. We've used that word quite a bit, vest. And there's a lot of paper on how that word is used. Can you just give us a snippet of how you're using vest? So in this context, we're talking about it in terms of whether or not plaintiffs are entitled to lifetime retiring medical benefits that can't be altered. I'll give you more time on rebuttal. If I could turn to classification again for a second. I guess stepping back, it seems to me that the parties' positions are these. And if I'm reading it wrong, please correct me. The plaintiffs are saying, you know, whatever the contracts say, that the 1993 negotiations between ACOA and the unions demonstrate that neither ACOA nor the unions thought that the retiree benefits terminated at the time of the expiration of the agreements. It seems like ACOA's position is, well, there are actually two groups of contracts. One has no language with regard to the termination, and the other one says it's terminated with the agreement. And under either one, the parties understood that the retiree benefits ended, eligibility for retiree benefits ended when the agreement terminated. So then the plaintiffs come back and say, well, no, because whatever the agreements might say, look at what happened in 1993 and all those post-negotiations. And I guess I have two questions to that. One is whether or not my kind of characterization of the parties' positions and where we are is correct. And second is if ACOA thought that and believed that the benefits ended for the pre-1993 retirees at the termination of the agreements, why did it engage in these negotiation process to try to cap those benefits anyway? Sure. If I'll answer your second question first. You have to remember that at the time ACOA was negotiating those agreements, Yardman was on the books in the Sixth Circuit. So ACOA definitely took the position that retiree medical benefits don't vest. That's all throughout the Curtis litigation. But at the same time, it realized that the instant it did anything to those pre-1993 retiree medical benefits, it was going to get sued in the Sixth Circuit. And in that case, the Yardman presumption was going to apply, and the thumb was going to be on the scales. So regardless of what ACOA thought the correct interpretation of the law was, it realized that there was a real litigation risk to doing anything with respect to the pre-1993 retirees. So it decided to mitigate that litigation risk by engaging in these negotiations for capped benefits. So you trade an uncertain liability for a certain one. That's why the negotiations made economic sense. As to your initial question, I think it's a bit broader than just those two claims. I think ACOA's position is fundamentally that whatever was said in those 1993 cap negotiations, you just can't use that extrinsic evidence without being able to, you know, certainly not without respect to contracts that aren't in the record. And even with respect to those contracts that are in the record, you have to have some common language in there on which to hang the label ambiguous. What if the plaintiffs come to you and say, hey, you know, we're willing to stipulate that all these other agreements, there are two categories, as you say, you meaning ACOA, you know, they either fall in two buckets. They either have no language or they have language saying they terminate at the end of the agreement. We'll stipulate to that. And so then we'll only focus on the 1993 negotiations and going forward. Would that address the issue? I don't think so, Your Honor, because even in that case, you still have to determine how that extrinsic evidence interacts with those buckets of cases. And that's going to vary based on what the remainder of the contractual terms in those agreements exist. And, you know, there is no such stipulation in the record. And, again, it seems passing strange to do that with respect to contracts governing 600 class members that aren't in the record. So is it your concern that Judge Young used this common question being the negotiations? The common question should have been what I'm hearing this morning, more focused on the underlying collective bargaining agreements. Correct, Your Honor. Again, this is fundamentally a breach of contract claim. I don't understand how you litigate a breach of contract claim on a class level without some common terminology among the contracts or even without the contracts themselves. Mr. Rimmer, I'll give you two minutes on rebuttal. Thank you very much. Thank you. We'll now hear from Mr. Hirt. Good morning. My name is Joel Hirt. I'm here on behalf of plaintiffs in the certified class below. I guess I will address the class certification issue and the issue regarding missing contracts as Alcoa has described them first. The first thing I want to say is that the CBAs are in the record for the vast majority of class members. There's a chart at the joint appendix. I have 50 written, but that's not right. It's already out. I think it's 350. This shows the main contracts and who is covered. It is true that there are some that neither party was able to locate. In fact, maybe 90% of the contracts produced in the case were produced by the unions, but these go back 50 years to 1968 in some cases. You had a lot of consolidation on both sides, both on the employer side and on the union side, so some just got lost. What's universally true is that Alcoa treated all of the pre-1993 retirees that didn't have a cap on their benefits uniformly. They were in the same plan. They administered the benefits in the same manner. When they came to analyzing whether to move to the health reimbursement arrangement, they treated them with one group. They called it the uncapped group. They made the same change at the same time. The distinction that was made during the negotiations was those that had retirement benefits before 1993 and those that were going to be subject to the cap. That's correct, Your Honor, and that's the whole dichotomy. There's been this fundamental relationship for decades. The pre-1993 retirees had lifetime uncapped health benefits, and the post-1993 retiree benefits had vested capped health benefits, but got increased pensions. They got increased 401ks, and they got other protections in the 1993 round of negotiations, such as making it a mandatory subject of bargaining moving forward. Actually, the post-1993 retirees clearly got benefits to survive the expiration of the contract because the cap, which was negotiated in 1993 for a three-year contract, couldn't be implemented until 1998. There's these whole facts and circumstances surrounding the 1993 negotiations that just make no economic sense, respectfully with my colleague. You wouldn't give up all of that. It was a huge issue for the company coming into the negotiations. Their chief negotiator, Russell Porter, said it was the number one concern going into those 1993 negotiations. What do you do with the conversation, at least on the other side? We heard your colleague mention that, Judge, at the end of the day, this is a breach of contract claim. Irrespective of if we classify or confirm the classification, but there's no contract for the court to look at to determine whether or not there was a breach. Well, a few things I want to say to that, Your Honor. First, we know there were contracts. Both sides agree on that. We know that the company was providing uncapped health care benefits pursuant to those contracts. It did it for decades. Under this court's framework for deciding retiree health care contract cases, and Judge Lee mentioned this, the Rosetto case and the Cherry, Viabra, and Gear case, you can use objective extrinsic evidence to show an ambiguity. There's four categories, or four bullet points, I guess, in those cases. The first one is where the contract is completely silent, underage. And the second is where you actually have patently unambiguous language within the four corners that's in favor of the company, not the retiree. So in those circumstances, you can still use the objective evidence here, the 1993 negotiations, primarily, and you can use those to establish a latent ambiguity. I mean, the same principles would apply absolutely where you don't have the contract, but both parties agree there was a contract, and then it provided health benefits. I mean, even if it was completely adverse to the retirees, as is mentioned in Cherry and Rosetto, you're still able to present objective evidence to create a latent ambiguity. And that's our argument here. Mr. Hurt, a couple questions. First of all, did the plaintiffs, did you and your colleagues consider excluding the putative class members for which you were not able to identify particular contracts? Did we consider it? We never presented that argument, Your Honor. We thought the facts that there's no dispute. First of all, at the beginning, we didn't know the universe of contracts. We had to get the information from the company and discovery of who retired when and from where. And by your estimation, what percentage of the putative class are there for whom the applicable contracts cannot be found? Yeah, that's a good question, and my colleague's using the 600 number. But if you look at the declarations in the record, that 600 number is at best described as people for whom ALCOA hasn't been able to link up to a particular contract. So they may be actually part of the master agreement, some of those 600 people, but ALCOA didn't keep the records because when somebody passed away, for example, a surviving spouse got a new retirement date that was after 1993 that just can't be connected, or they identified a plant in Mexico which has no connection. What's the denominator for that? So what is the total class? I believe it's around 3,000, Your Honor. Okay. So let me ask you this. So you want the court to – the district court – you asked the district court to consider extrinsic evidence, meaning the 1993 negotiations and the interactions thereafter. That would establish that a particular contract is ambiguous under the latent ambiguity theory. I think Mr. Ramer raises an interesting point, which is that that's just one extrinsic evidence point. There may be other in the negotiation of those particular CBAs, for example, or in the performance of those CBAs, other extrinsic evidence with regard to a particular CBA that may be relevant to this question. And I think ALCOA's position might be – perhaps it is – that if you want the court to engage in this analysis of looking at extrinsic evidence, don't you have to assess whether or not there's other extrinsic evidence with regard to a particular CBA that you think is ambiguous? And secondly, doesn't that mean that we have to at least start with the CBA to see what the negotiations were surrounding that CBA and see what other extrinsic evidence might be relevant in addition to the 1993 and later negotiations? Sure. A couple points in response to that. First is we had a full discovery. We had cross motions for summary judgment. We had a very developed record with – I don't know – scores of exhibits. They haven't identified any extrinsic evidence to that effect. They didn't put any in the record. They didn't oppose our summary judgment motion by putting forth extrinsic evidence from this contract in this year in this facility. It's just not in the record, Your Honor. It certainly was not – wouldn't be fair not to consider it. Well, I think it's hard for us to assess because the district court didn't either because the district court relied upon judicial estoppel. And so the – at least from the record that's before us, it wasn't quite clear to me what the universe was of the extrinsic evidence that the parties were able to uncover. I can see a world where if the plaintiffs basically admit that all of the governing contracts have language that on its face is not ambiguous or unambiguously – I can foresee a strategy where the plaintiffs might say, you know what, we will admit what the contracts did or did not say and that on its face as interpreted that one can assume that the retiree benefits end at the end of the contract, but we're going to rely upon the 1993 negotiations kind of taking those issues completely off the table. But the plaintiffs didn't do that here. And so it – Alcoa's theory has some, I think, some superficial intuitive appeal that's saying, look, if you're going to look at the negotiation history and the extrinsic evidence to interpret a particular CBA, you need to kind of also look at the CBA and figure out what was going on at the time. I think we absolutely did argue in the alternative that even if the language were absolutely against the retirees, that we would still be able to put forth and win the case on the objective extrinsic evidence regarding the 1993 negotiations. And on the judicial estoppel question, I know that there's a link made that those collective bargaining agreements suggested that the pre-1993 retirees were entitled to lifetime retirement benefits. Where below did the district court make the connection that Alcoa could not unilaterally modify those benefits? Where did the district court in the record? I can't give you the precise page to the record, but I can tell you the district court recognized a couple statements that Alcoa had made in the Curtis litigation. The first was in opposition to motion preliminary injunction, Alcoa said, plaintiffs seek to receive benefits as if they had retired before June 1, 1993, meaning the plaintiffs and Curtis were seeking lifetime uncapped benefits. And Alcoa is saying... What I'm saying, if I accept that... Yes. Where is the language that says that they can't modify it unilaterally? Where is the language that they represented that? So we don't have collective bargaining agreements. Well, the company's lead negotiator, Russell Porter, testified at the Curtis trial in 1993, and this will dovetail with a question you asked Mr. Raymer about the meaning of vested. He asked, he testified that the benefits were not vested as the Curtis plaintiffs saw them, meaning vested like pension benefits by statute that are forever unalterable. But he said, at trial, we cannot make changes to it without negotiating with the unions. In our case, he testified, we can't touch the pre-1993 retirees' benefits. He was the lead negotiator in 1993, and that was his understanding. So I don't know if that answered your question. I was trying to. Are the plaintiffs claiming that the pre-1993 collective bargaining agreements gave the class vested lifetime uncapped benefits? They're arguing that they were vested in the sense they survived the expiration of the agreement and they cannot be unilaterally reduced by ALCOA. They can only make changes through negotiations with the union. On the collateral estoppel, the district court had a lot of discretion there, but phrased our Girard case as having a principle that a party, the judicial estoppel here, I'm quoting from the district court, the principle applies when a party cannot maintain. This is about a change in law, giving rise to a change in position. And the district court is saying the principle applies when the party cannot maintain its prior position due to a substantive change in the law. And I don't read Girard as saying that the party somehow has to be compelled by the change in law to change its position. And that would strike me as a principle that could get in the way of counsel arguing the case under the existing law. Was that error of the district court to take Girard for that principle? No, I don't think so, Judge Kohler. And I guess I'd just take a step back. This is a very discretionary standard. The Supreme Court of New Hampshire remains that it can't be reduced to a general formulation. There are no fixed prerequisites. Three factors typically inform the analysis, but there can be additional factors as well. Now, in the Girard case, a defendant made an argument initially, and then there was a change in controlling Indiana case law. So when it came to the later proceeding, it just had no way it could keep that prior position without running afoul of the law. And the court said in those circumstances, you know, I'm going to not exercise my discretion to stop them. And I think what Judge Young was saying is this is a different case. The point of contract interpretation is to ascertain the intent of the parties. And the Sixth Circuit had one method for doing that in Yardman. It got changed, but that doesn't mean that the parties' intentions changed. It doesn't mean they still couldn't have vested benefits. They argued that they vested benefits and they won in the Curtis case. You know, they didn't have to do that. So I think he was saying in those circumstances that's a different scenario than in Girard. I mean, maybe it's not the categorical rule that you read the court to say. Maybe that's not appropriate. I see my time is up. My question with regard to the judicial estoppel issue is that it seems to me that whatever position Alcoa may have taken with regard to the vesting status of the pre-1993 retirees, that that fact and that position was completely immaterial to the claims raised by the plaintiffs in Curtis. Because in Curtis you were dealing with post-1993 retirees. Why isn't that dispositive of the judicial estoppel issue? Because one of the requirements is the court has to rely upon the representation in reaching its decision. And here it's hard to see the court relying upon any position with regard to the pre-1993 retirees to reach decisions because the claims before it had nothing to do with that. Well, I think you have to understand that, you know, collective bargaining agreements, you don't start fresh each contract each time. You work from the prior contract and you negotiate changes. So one of the things you do, one of the Rosetto, Cherry thing, is you look at related contracts at the same facility or even the same employer and industry practice because they all flow together. There's very little change in language contract to contract because people don't want to, you know, if they agree on something they just don't revisit it, they bring it forward. So that's why the contracts are very similar year to year. But the whole fact of the 1993 negotiations and the fact you had Alcoa's lead negotiator testify they were willing to weather a strike to get the cap. It was their number one priority to reduce retiree health care benefits. You know, they made it only able to implicate the cap after the expiration of the agreement. They made it a mandatory subject of bargaining. None of those positions, none of those facts make sense if Alcoa already had the right in the pre-1993 CBAs to terminate the benefits at the end of the contract. But one would think that if that was material to the court's decision, as Judge Pryor alluded to, then you would see it in the, you know, very voluminous findings of fact that the district court in Curtis issued. And so if – and, you know, I was looking for that. I was looking for some reference that would at least give me – that would give the inference that that was something that the court was relying on to reach its decision. But I couldn't find it in the Curtis court's order. I think it was so prevalent and so assumed that even the Sixth Circuit said it explicitly that the 1988 contracts contained vested lifetime benefits. Before we sit down, if I could ask you a bit more about the classification issue. Sure. So, you know, you said you argued in the alternative that the – assuming the contracts on, you know, on the four corners provides that the retiree benefits would terminate at the termination of the CBA, that the 1993 negotiations and our work provide create latent ambiguity. I guess my question to you is for the purposes of appeal, are you prepared to concede at this point that the – to the extent that there weren't any contracts, they can't find specific contracts, that on the four corners that those contracts should be interpreted or can be interpreted to state that the retiree benefits terminate at the end of the – of those CBAs? I'm not prepared to stipulate to that as a matter of fact because I don't think it's accurate and we have record in the record for the district court otherwise. They're certainly making the legal argument that even if the court were to disagree and find that were the case, we would still be able to present the objective evidence of the latent ambiguity. Okay. Thank you. Thank you. Judge Lee, you're absolutely right. It simply cannot be the case that Alcoa could be stopped on the basis of any representations made regarding the pre-1993 retirees in the Curtis litigation because the rights of those retirees were simply not at issue there. But even more fundamentally – But I need to stop you there. I understand Judge Lee likes it when people think he's right. But when we say – How do you know that? I know you. The question that we're having is the back and forth is in those findings of fact, the plaintiffs asked – in the Curtis litigation, I'm sorry. The plaintiffs asked, let's clean this language up and have the plaintiffs say, health care benefits under Alcoa's plan are best at lifetime benefits and according with paragraph 236 and 237 of the findings of fact. Alcoa comes back and says – opposed that modification and said the plaintiffs were entitled to vested benefits. And the language – I'm going to read it here. It says, even before this court's ruling, Alcoa was committed to providing benefits to members of the plaintiff class as a 2006 cap level. As such, a formal order that those benefits are vested would provide members of the class with nothing more than what Alcoa has agreed to give them. Sure. And a couple points on that. That all has to be read in context. The commitment to provide them was referring to the 2006 CBA that was in place at the time. Alcoa was referring to only the post-1993 retirees in that context. And there was an express CBA on that point. Again, we are talking about pre-1993 retirees in this litigation. And not only was there no representation regarding the rights of pre-1993 in the Curtis litigation, Alcoa couldn't have won anything on that basis. And that's why Judge Kohler, no matter how much discretion the district court had, what it did here was beyond the pale. Because if judicial estoppel means anything, it means you actually have to assert inconsistent positions and actually win something on it between two litigations. And that's just not what happened here. Thank you. We'll take the case under advisement. Thank you, Counsel.